523 A.2d 1161

**Eleanore STINNER, Appellant,**

v.

**Donald E. STINNER, Bethlehem Steel Corporation.**

Superior Court of Pennsylvania.

Argued Oct. 23, 1986.

Filed April 6, 1987.

Jackson M. Sigmon, Bethlehem, for appellant.

James R. Fiorentino, Bethlehem, for Stinner, appellee.

Before WIEAND, OLSZEWSKI and CERCONE, JJ.

WIEAND, Judge:

The issue in this appeal is whether the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Retirement Equity Act of 1984 (REA),[1] permits the attachment of undistributed pension benefits to enforce a judgment recovered for breach of a pre-Divorce Code[2] agreement to pay alimony. The trial court held that such an attachment was not permitted and dismissed the writ. We affirm.

Eleanore Stinner and Donald Stinner were divorced on September 6, 1977. Prior thereto, on June 16, 1977, they had executed a written, property settlement agreement by the terms of which Husband agreed to pay Wife the sum of two hundred fifty ($250) dollars per week as alimony for and during the remainder of Wife's natural life or until she remarried. Husband made these payments until May 21, 1979, when he stopped and refused to make further payments.

On July 2, 1979, Wife filed a complaint in assumpsit alleging breach of contract by Husband. She also filed a separate action in equity seeking a decree enforcing the provisions of the agreement which provided for continuing alimony payments. Summary judgments were entered in favor of Wife on February 5, 1980. In the assumpsit action, judgment was entered in favor of Wife and against

1. 29 U.S.C. § 1001 et seq.

2. Divorce Code of April 2, 1980, P.L. 63, 23 P.S. § 101 et seq., effective June 30, 1980.

Husband in the amount of $8,666.72. In the equity action, a decree was entered directing Husband to perform his agreement by paying $250 per week until Wife died or remarried. This order was affirmed on appeal without published opinion. *Stinner v. Stinner*, 296 Pa.Super. 645, 440 A.2d 1262 (1981). When Husband's default continued, Wife caused a writ of attachment to be issued against Husband's pension plan, naming as garnishee the "Bethlehem Steel Corporation Pension Plan for Salaried Employees."[3] The pension plan administrator denied that the pension plan was subject to attachment because the writ of execution was not a "qualified domestic relations order," which is necessary to permit an attachment of pension plan benefits under Section 206(d) of ERISA, as amended by REA, 29 U.S.C. § 1056(d). The dispute was submitted to the trial court on an agreed statement of facts, and the court, following argument, entered an order dismissing the writ of execution. Wife filed exceptions, but these were also dismissed. She then appealed to this Court.

■ Initially, we address the propriety of wife's filing exceptions. The procedural rules pertaining to the enforcement of money judgments are contained at Pa.R.C.P. 3101 et seq. They do not specifically require or provide for post-trial relief in the nature of exceptions. However, Pa.R.C.P. 3145(a) provides that, as far as practicable, the procedure between plaintiff and garnishee shall be the same as though "the interrogatories were a complaint and the answer of the garnishee were an answer in a civil action." Rule 3147, moreover, contemplates a trial to resolve factual issues raised by the pleadings. If we continue the analogy by applying generally the rules applicable to civil actions, there would seem to be no reason not to apply the post-trial motion provisions of Pa.R.C.P. 227.1 to litigation between a judgment creditor and a garnishee. We conclude, there-

3. The praecipe for writ of execution recited an accrued indebtedness of $75,883.48, plus interest of $4,553.01.

fore, that appellant's motion for post-trial relief, even though mislabeled "exceptions," was procedurally proper.

The pension plan established by Bethlehem Steel Corporation is governed by ERISA. The language of ERISA, at 29 U.S.C. § 1144, provides that ERISA shall supersede any and all state laws insofar as they might otherwise pertain to employee benefit plans. As originally enacted, ERISA prohibited any assignment or alienation of pension benefits. In the years following enactment, however, there was substantial dissatisfaction with the harsh impact of ERISA in support cases. This dissatisfaction was particularly evident among the state courts which advocated exceptions to the non-alienability provisions of ERISA with respect to the enforcement of family support orders. In 1984, therefore, Congress enacted the REA amendment to ERISA. This amendment carved out a specific exception to the anti-alienation provisions to allow employee benefit plans to honor claims made pursuant to "qualified domestic relations orders." Under the REA amendment, pension benefits can be attached pursuant to a "qualified domestic relations order" issued by a state court.

The relevant language of ERISA, as amended by REA, is as follows:

(d) Assignment or alienation of plan benefits

(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

. . . .

(3)(A) Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that *paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order.* Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

(B) For purposes of this paragraph—

(i) the term *"qualified domestic relations order"* means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) *the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—*

(I) *relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and*

(II) *is made pursuant to a State domestic relations law (including a community property law).*

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order—

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

. . . .

(G)(i) In the case of any domestic relations order received by a plan—

(I) the plan administrator shall promptly notify the participant and any other alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

(II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

(ii) Each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Such procedures—

(I) shall be in writing,

(II) shall provide for the notification of each person specified in a domestic relations order as entitled to payment of benefits under the plan (at the address included in the domestic relations order) of such procedures promptly upon receipt by the plan of the domestic relations order, and

(III) shall permit an alternate payee to designate a representative for receipt of copies of notices that are sent to the alternate payee with respect to a domestic relations order.

29 U.S.C. § 1056(d) (emphasis added). The exception created by REA to the non-alienability of pension rights is narrow. It does not generally permit attachment against a

pension plan to enforce a money judgment recovered for breach of contract.

Appellant concedes that neither her money judgment nor the court's decree of February 5, 1980 meets the requirements of a "qualified domestic relations order." She argues, however, that the court's order is a "domestic relations order" which is governed by REA's transitional provisions. These provisions dictate that in the case of a domestic relations order entered before January 1, 1985, the plan administrator

(1) *shall* treat such order as a qualified domestic relations order if such administrator is paying benefits pursuant to such order on such date, and

(2) *may* treat any other such order entered before such date as a qualified domestic relations order even if such order does not meet the requirements of such amendments.

29 U.S.C. § 1001 (note 303(d)) (emphasis added).

■ Wife's basic premise is faulty. The court's order of February 5, 1980 is not a "domestic relations order." That order was based on an agreement dated June 16, 1977 and although it "relate[d] to ... alimony payments," it was not "made pursuant to a State domestic relations law," as required by 29 U.S.C. § 1056(d)(3)(B)(ii). Instead, it was an order based on a property settlement contract enforceable pursuant to general rules pertaining to the enforcement of contracts and not by virtue of any domestic relations law.

■ Prior to the Divorce Code of 1980, which became effective June 30, 1980, the law in this Commonwealth did not recognize permanent alimony except in cases where a dependent spouse was insane. See: *Lyall v. Lyall,* 240 Pa.Super. 649, 361 A.2d 367 (1976); *Hedderick v. Hedderick,* 163 Pa.Super. 564, 63 A.2d 373 (1949); *Hickey v. Hickey,* 158 Pa.Super. 511, 45 A.2d 380 (1946); *Commonwealth v. Scholl,* 156 Pa.Super. 136, 39 A.2d 719 (1945). See also: Divorce Law of May 2, 1929, P.L. 1237, § 45, 23 P.S. § 45. Because Husband and Wife were divorced in

1977, Wife could not have recovered permanent alimony under the law of this Commonwealth. The duty of support which Husband owed to Wife pursuant to the domestic relations law of this Commonwealth came to an end when a decree in divorce was entered. *Commonwealth ex rel. Smith v. Smith,* 260 Pa.Super. 203, 393 A.2d 1224 (1978); *Watson v. Watson,* 243 Pa.Super. 23, 364 A.2d 431 (1976). Wife's rights, subsequent to divorce, were limited to those which had been created by contract. With respect to alimony payments provided by contract, Husband became a debtor and Wife became a creditor; and Wife's rights were determined accordingly. *Schmitz v. Schmitz,* 305 Pa.Super. 328, 451 A.2d 555 (1982). Wife's right to recover a judgment for the nonpayment of alimony was based on contract and not on the domestic relations law of this Commonwealth. See: *Hollman v. Hollman,* 347 Pa.Super. 289, 500 A.2d 837 (1985). See also: *Schmitz v. Schmitz, supra; Commonwealth ex rel. Jones v. Jones,* 216 Pa.Super. 1, 260 A.2d 809 (1969).

Appellant's reliance upon *Hopkinson v. Hopkinson,* 323 Pa.Super. 404, 470 A.2d 981 (1984), is misplaced. That decision was based upon the provisions of ERISA prior to its amendment by REA. Moreover, the order there being enforced was a consent decree ordering the husband to pay arrearages under an agreement for the support of children. Similarly, the decision in *Magrini v. Magrini,* 263 Pa.Super. 366, 398 A.2d 179 (1979), was not only based upon an unamended ERISA, but concerned the validity of proceedings to attach an ALCOA pension fund to enforce a support order which had been entered pursuant to the Civil Procedural Support Law, 42 Pa.C.S. § 6701 et seq. Finally, the Supreme Court decision in *Young v. Young,* 507 Pa. 40, 488 A.2d 264 (1985), is also not determinative. There, the Court permitted a woman to attach the pension fund of her former husband, a police officer for the City of Easton, to enforce a judgment transferred from the State of New Jersey, where a court had entered a decree of equitable

distribution. The Court's decision involved an interpretation of the provisions of Pennsylvania's Third Class City Code of 1931, as amended, 53 P.S. § 35101 et seq., and did not involve either ERISA or REA. In contrast to these cases, the decision of this Court in *Hollman v. Hollman, supra*, pertained to the exceptions which REA specifically carved out of the anti-alienation provision of ERISA. There, we determined that a private support agreement, as opposed to a court order for support, was no different than any other contract and, therefore, could not be the basis upon which a party would be permitted to garnish his or her former spouse's pension.

Wife argues that because she was precluded by Pennsylvania law from recovering alimony in 1977, the only way in which she could provide for post-divorce support for herself was by contract. Whether it be called alimony or support, she suggests, the payments due her were such as to come within REA's purpose of establishing a strong policy in favor of spousal support. When the words of a statute are free from ambiguity, however, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). See: *In re Fox's Estate*, 494 Pa. 584, 588–589, 431 A.2d 1008, 1011 (1981); *Salvado v. Prudential Property and Casualty Ins. Co.*, 287 Pa.Super. 304, 308, 430 A.2d 297, 299 (1981). The language of ERISA, as amended by REA, is clear; a "domestic relations order" sufficient to qualify for enforcement against undistributed pension benefits must have been entered pursuant to "a State domestic relations law." Wife's right to alimony in the instant case was based solely on contract and not on the domestic relations law of Pennsylvania. Enforcement of the contract calling for alimony payments could not be accomplished by attaching Husband's undistributed benefits in the Bethlehem Steel Corporation Pension Plan for Salaried Employees. Therefore, the trial court properly dismissed Wife's writ of attachment.

Order affirmed.